· No. 70,151

WATER DISTRICT NO. 1 OF JOHNSON COUNTY, *Appellant,* v. THE CITY COUNCIL OF THE CITY OF KANSAS CITY, KANSAS, and THE CITY OF KANSAS CITY, KANSAS, *Appellees.*

(871 P.2d 1256)

Opinion filed April 15, 1994.

*Wilson E. Speer,* of Speer, Austin, Holliday & Zimmerman, of Olathe, argued the cause, and *Michael J. Armstrong,* of the same firm, was with him on the brief for appellant.

*N. Cason Boudreau,* deputy city attorney, argued the cause, and *Harold T. Walker,* city attorney, was with him on the brief for appellees.

The opinion of the court was delivered by

SIX, J.: This is a land use case involving the validity of conditions imposed in granting a special use permit. The contestants are both governmental units. Water District No. 1 of Johnson County (District) is dissatisfied with the decision of the City Council of Kansas City, Kansas (City). The District sought a special use permit for additional inert treatment residue basins on District land located in the City. The City granted the permit, subject to nine conditions. The District objected to the conditions and appealed under K.S.A. 12-760 (any person aggrieved may maintain an action in the district court to determine the reasonableness of the final decision). The trial court upheld the City's decision. Our jurisdiction is under K.S.A. 20-3017 and K.S.A. 1993 Supp. 60-2101(b). We granted the District's motion to transfer to this court.

We must decide whether the conditions imposed in granting the District's request are reasonable and whether they conflict with the State's preemption of the water treatment process.

### Scope of Review

The scope of review in zoning cases is governed by a series of concepts we summarized in *Combined Investment Co. v. Board of Butler County Comm'rs*, 227 Kan. 17, 28, 605 P.2d 533 (1980). See *Davis v. City of Leavenworth*, 247 Kan. 486, 492-93, 802 P.2d 494 (1990). We have applied these concepts to the review of special use permit decisions. See *Daniels v. Board of Kansas City Comm'rs*, 236 Kan. 578, 584, 693 P.2d 1170 (1985). The *Combined Investment* concepts provide a prologue for our analysis in the case at bar:

"(1) The local zoning authority, and not the court, has the right to prescribe, change or refuse to change, zoning.

"(2) The district court's power is limited to determining
   (a) the lawfulness of the action taken, and
   (b) the reasonableness of such action.

"(3) There is a presumption that the zoning authority acted reasonably.

"(4) The landowner has the burden of proving unreasonableness by a preponderance of the evidence.

"(5) A court may not substitute its judgment for that of the administrative body, and should not declare the action unreasonable unless clearly compelled to do so by the evidence.

"(6) Action is unreasonable when it is so arbitrary that it can be said it was taken without regard to the benefit or harm involved to the community at large, including all interested parties, and was so wide of the mark that its unreasonableness lies outside the realm of fair debate.

"(7) Whether action is reasonable or not is a question of law, to be determined upon the basis of the facts which were presented to the zoning authority.

"(8) An appellate court must make the same review of the zoning authority's action as did the district court." 227 Kan. at 28.

In addition to the scope of review concepts used to analyze special use permit cases, we have noted that the factors in *Golden v. City of Overland Park*, 224 Kan. 591, 598, 584 P.2d 130 (1978), should be considered by the zoning body. The *Golden* factors can aid the reviewing court in determining the reasonableness and validity of zoning determinations. See *Davis*, 247 Kan. at 493; *K-S Center Co. v. City of Kansas City*, 238 Kan. 482, 494, 712 P.2d

1186 (1986). In *K-S Center Co.,* we held the *Golden* factors are to be applied in special use permit cases. 238 Kan. at 494-95.

## Facts

The District is a quasi-municipal urban water supply and distribution district established under K.S.A. 19-3501 *et seq.* Service is provided to approximately 300,000 people, most of whom reside in Johnson County, Kansas. A special use permit was sought to construct water treatment residual disposal monofills, also known as sludge lagoons, in the City. Monofills are used for the deposit of a by-product of the District's water softening treatment process. The treatment process produces an inert residue, lime, that consists primarily of calcium carbonate and magnesium hydroxide. The Kansas Department of Health and Environment (KDHE) reviews and permits the use of this type of residue treatment. The District began using the monofill in 1975 on a 34-acre tract in the 100-year flood plain. The tract was purchased by the District in 1985.

In 1990, the District decided a second monofill was needed and applied for a special use permit. The City granted the permit, subject to four conditions:

"1.  The entrance area being fenced;
"2.  The area is kept cleaned up and maintained;
"3.  This approval is viewed as only a temporary solution and they (the District) should look for a long-term solution, and that solution should not be merely more lagoons at this location; and
"4.  The existing lagoon being covered and landscaped when it is adequately stabilized."

The 1990 monofill was characterized as a short-term solution to the treatment discharge problem that would give the District time to explore alternatives.

In 1991, the District submitted an application to the KDHE for a demonstration program of controlled discharge of the lime residue into the Kansas River. The District sought river discharge because the monofill produced several adverse effects, including an impact on land use, the concentration of possible hazardous substances, and the expense of construction. KDHE denied the application.

The District, in August 1991, submitted the second special use permit petition to the City. The application expressed the District's intent to construct two additional monofills on the remaining 25 acres of the 34-acre tract. The City's planning staff issued a review summary identifying three issues the staff believed needed to be considered by the City: (1) the environment; (2) development; and (3) the balancing of interests as required by the courts in zoning cases which involve another governmental agency. No one opposed the petition. The Planning Commission recommended approval, subject to three conditions:

"A) Softening residual only. (This avoids presedimentation residuals that are currently returned to the river.) B) The duration of the special use permit being ten years. C) Measures are taken as necessary to assure that the areas of the monofills will be able to support buildings similar to what could be supported if the monofills were not present without extra expense for special foundations. Such measures would include at least the placement of 12 feet of fill above the monofills with the first 6 feet compacted as set out in item #4 of Terracon's August 28, 1991, letter."

The City agreed to hold the application over for two months to allow Johnson County and the City to discuss the possibility of cooperation in the area of wastewater treatment facilities. (The City currently operated a sewer treatment plant at a level well below capacity. There was a belief among some council members that Johnson County should contract to use that plant rather than construct its own.)

A motion for approval of the permit failed on a vote of three to four. A five-to-two vote was required to deny the permit because the Planning Commission had recommended that the permit be approved. K.S.A. 12-757(c). The petition was returned, and the Planning Commission again recommended approval.

Upon completion of testimony in the second hearing, the City approved the permit, subject to nine conditions (conditions 4, 5, 6, 7, 8, 9, and the four years in condition 2, originated with the City):

"1) That this monofill be used for the disposal of softening residuals only. [*A Planning Commission condition, accepted by the District.*]

"2) The duration of the special use permit being four years. [*The Planning Commission condition was 10 years.*]

"3) That measures be taken as necessary to assure that the areas of the monofills will be able to support the buildings similar to what could be supported if the monofills were not present without extra expense for special foundations. Such measures should include at least the placement of 12' of fill above the monofills with the first 6' compacted as set out in Item #4 in Terracon's August 28, 1991, letter, which we've been provided with. [*A Planning Commission condition, accepted by the District.*]

"4) There be an understanding that this request is for residual monofills only and that should changes be proposed that require the hauling of material onto or off the site, City Council approval and/or a new special use permit would be necessary.

"5) Johnson County Water District No. 1 shall submit an annual report to Planning and Zoning which shall detail the progress of the project including but not limited to: a) Volume deposited/capacity remaining; b) Annual testing for toxicity based on EPA methods; and c) Progress of compaction procedure.

"6) After three years, an update report addressing alternative disposal methods shall be submitted to the City Council. We've already been provided with some information concerning alternative disposal methods such as agricultural uses, uses in concrete productions, those kinds of things. We would like to hear back on that.

"7) That there be a submission of a Redesigned Remediation Plan.

"8) Johnson County Water District No. 1 guarantee that they will fund any remediation or clean-up of the site required by future regulations or findings concerning toxicity and that the guaranty be executed by the Water District guaranteeing to the City that each and every condition of this special use permit will be performed.

"9) That this approval be pending Findings of Fact and Conclusions of Law being prepared and passed upon by this body."

An engineer retained by the District expressed concern with the four-year limitation. A council member inquired, "Your principal concern is the duration of the Special Use Permit and everything else you think you can live with?" The engineer replied, "Yes sir."

## The Trial Court Proceedings

The trial court observed that in *K-S Center Co.*, 238 Kan. at 495-96, we approved the practice of making a preliminary decision on a special use permit subject to the later adoption of findings of fact and conclusions of law. The court noted that the City followed such a procedural course in the instant case. The City's findings and conclusions were examined. The court found that the City properly considered the *Golden* factors and the cri-

teria under its special use permit ordinance. The trial court analyzed the nine restrictions imposed on the special use permit, concluding:

"Arguments that through imposition of conditions the City has conferred upon itself unlimited revocation powers are based upon the premise the City Council will be arbitrary and capricious in the future. The past practices of the City Council in approving the proposals of the Water District clearly indicate it respects the public character of the Water District and the service it renders to the residents of its jurisdiction. Any revocation of the permit by the City would be an action reviewable by the courts and would be invalid if arbitrary and capricious."

### The District's Contentions

The conditions imposed on the special use permit by the City were invalid because they were not based upon legitimate zoning issues. The conditions denied the District the effective enjoyment of its permit so that it is in no better position than if the permit had been denied. The conditions, especially the four-year permit duration limit, eliminated the ability either to use the land for its intended purpose or to make any long-term plans regarding the monofill operation.

The City erroneously believes that it has unlimited discretion to impose conditions on special use permits. Conditions are not valid unless they serve a legitimate zoning purpose. The conditions must meet three standards: (1) be clearly expressed with sufficient clarity to give notice of the limitations on the use of the land and provide sufficient standards for enforcement; (2) relate directly to the proposed use of the land and not to the manner of the operation of the enterprise; and (3) address a legitimate zoning purpose that bears a reasonable relationship to the public health, safety, and welfare.

Conditions 5, 6, 7, and 8 are void of any standards against which compliance can be measured. Conditions 2, 4, and 6 relate to the manner of operation rather than to land use. None of the conditions were based on legitimate zoning concerns and, in fact, were based on improper political considerations. Cities cannot exercise their police power in a way that is arbitrary, oppressive, or capricious.

The City has presented a weak argument concerning the possibility that the monofill operation could, at some point in the future, present a risk to public health and the environment. The City's claims concerning environmental hazards are contrary to the evidence. Consequently, the conditions were an invalid exercise of zoning and police power. The conditions are arbitrary, unreasonable, and capricious under the *Golden* factor analysis. The District did not concede, through the engineer's statement, that the only negative condition was the four-year limit.

### The City's Response

The facts do not support the claim that the conditions eliminated the District's ability to use the land or to make long-term plans. The District can and is using the land as a monofill for the four-year term. Imposition of the time limitation only requires the District to go through an additional permit request process before the remaining capacity of the monofill area is exhausted. The City has encouraged long-term planning. It also has insisted, however, that it provide input and further approval for the extension and expansion of the monofill operation beyond the four years. Special use permits are authorized. The City's ordinance states that a special use permit may be granted "under such conditions as to operation, site development, signs, time limit or other conditions as may be deemed necessary to assure that the use will not injure neighboring property or the welfare of the community."

Quasi-judicial zoning decisions are not removed from the political arena. The *Golden* criteria are, in essence, political issues. The District's project will cover 50 acres of property with 15 feet of lime sludge and create no jobs for the City's citizens. The project will pay no taxes and has the potential of not only preventing any future development of the property, but also of adversely affecting development of the adjoining property. The conditions reasonably and legitimately address concerns of the City. Although the monofill waste cannot be classified as a hazardous material under EPA regulations, the waste can be viewed as a potential environmental problem. The reporting requirements allow the City to monitor the progress of the monofilling and insure

that it will be informed if the toxicity level of the waste material changes. One annual report is not unduly burdensome. The City's best interest is to encourage the continued review of alternate disposal methods because the District will need additional land to satisfy future waste disposal needs. This new land would be removed from the City's tax rolls.

The only resulting hardship documented by the District is the fact that it will be required to divide the area into additional lagoons. The necessary berms needed to divide the area would use additional property that could not be used for monofilling. If the District applies for an extension beyond the four years, the City may not be arbitrary or capricious and deny the permit. Any revocation of the District's permit would be reviewable by the courts. The conditions imposed are rationally related to the City's authority under police powers. The City may promote the general welfare through actions that encourage property development and preservation of the tax base. The conditions imposed would not appreciatively interfere with the District's function of providing safe and clean water. The monofill is the most economical disposal method available and the costs of the conditions imposed, when compared with disposal alternatives, will be negligible.

## Discussion

The trial court carefully reviewed each condition and found that, under the facts and evidence, they were rationally related to the public welfare goals advanced by the City. We agree with the trial court's analysis. The City has discretion in deciding what would be in the best interests of its citizens. Furthermore, the analysis of the *Golden* factors set forth by the City in its conclusions of law provides an additional basis for assessing the defensibility of the City's stated reasons for its actions. See *Taco Bell v. City of Mission*, 234 Kan. 879, 887, 678 P.2d 133 (1984). None of the conditions are a barrier to the District's use of the land. Conditions are commonly imposed on special use permits. 3 Anderson, American Law of Zoning § 21.30 (3d ed. 1986). The four-year limitation will not prevent District planning.

In *Golden*, we recognized the quasi-judicial nature of zoning decisions because such proceedings involve: (1) a consideration

of policy; (2) the weighing of evidence; (3) the balancing of equities; (4) application of rules, regulations, and ordinances to facts; and (5) a resolution of specific issues. 224 Kan. at 597. In *Landau v. City Council of Overland Park*, 244 Kan. 257, Syl. ¶ 4, 767 P.2d 1290 (1989), we explained that

"[c]ities and counties in Kansas are entitled to determine how they are to be zoned or rezoned. Elected officials are closer to the electorate than the courts and, consequently, are more reflective of the community's perception of its image. No court should substitute its judgment for the judgment of the elected governing body merely on the basis of a differing opinion as to what is a better policy in a specific zoning situation."

The City's concerns regarding the possible impact the monofills could have on its interests were reasonable. Cities have the police power authority to promote the general welfare of their people by taking actions to encourage property development and to preserve the tax base. The conditions imposed on the special use permit were rationally related to those objectives and were not unreasonable or oppressive. Importantly, the trial court decided that the conditions would not appreciatively interfere with the District's function of delivering safe, clean water to its customers. Even with the conditions, the permitted monofill is a more economical method for disposing of the residual waste than any other available alternative. We do not agree with the District's contention that the conditions are unreasonable and oppressive.

## The State's Preemption of the Water Treatment Process

The trial court considered the preemption issue and determined that nothing in the language of K.S.A. 65-163 *et seq.* preempted the City's right to subject the District to its zoning ordinances. The court explained that the statutory provisions pertain to the state public water supply permit requirements and not to the disposal of waste. The trial court also concluded that the City's right to place more stringent controls on waste management than those imposed by the State had not been preempted. K.A.R. 28-29-1, adopted by the KDHE, states:

"**Scope and content.** These regulations shall not interfere with the right of cities or counties to enact ordinances or resolutions for control of solid waste management practices which are more stringent than the requirements of these

regulations except, a local agency shall not enforce a requirement, other than those in this article, which would impede interstate or intrastate transportation or disposal of solid waste, or which would impede establishment or use of facilities for regional management of solid waste."

## The District's Contentions

The conditions imposed by the City on the special use permit are inconsistent with State preemption of the water treatment process. The Kansas Constitution, Article 12, § 5 home rule power to determine local affairs is limited to statutory enactments of statewide concern that are uniformly applicable to all cities. *Blevins v. Hiebert*, 247 Kan. 1, 5-6, 795 P.2d 325 (1990). Local regulation will be deemed " 'in conflict' " with a statute that undertakes comprehensive coverage to attain statewide uniformity. See *Jennings v. Walsh*, 214 Kan. 398, 401, 521 P.2d 311 (1974); and *Uhl v. Ness City, Kansas*, 590 F.2d 839 (1979).

Public water supply systems are regulated under K.S.A. 65-163, which authorizes the Secretary of Health and Environment (Secretary) to issue public water supply system permits. K.S.A. 65-163, by definition, provides the Secretary with the authority to govern all aspects of water supply systems, including the source, treatment, storage, and distribution facilities. The fact that the KDHE has interpreted K.S.A. 65-163 to be comprehensive is shown by the inclusion of the treatment monofill within the District's permit.

Local regulation that reduces or otherwise limits the use, duration, and operation of water treatment monofills necessarily conflicts with state regulation providing comprehensive coverage of the subject matter. K.S.A. 65-3401 *et seq.* relates to solid waste and K.S.A. 65-3410(b) authorizes cities to adopt regulations and standards concerning solid waste as long as they are in conformity with those adopted by the Secretary. The Secretary has established formal policies regulating the disposal of water treatment residues in monofills.

The City, through the imposition of the conditions on the special use permit, has affected the operation and cost of water treatment for citizens who, for the most part, are outside the City's jurisdiction. Extra-territorial control by the City comes without

the broader perspective, provided by state legislation, needed to protect the members of the public who depend on the District for water.

Water treatment residue is not a solid waste. The City's position conflicts with K.S.A. 65-3410(b). KDHE has endorsed the use of monofills so the City's regulation conflicts with State control. The regulation relied on by the City, K.A.R. 28-29-1, is of no use because the administrative regulation cannot contravene the controlling statute, K.S.A. 65-3410(b).

## The City's Response

The special use permit conditions do not conflict with the State's preemption of water treatment processes. The City reviewed the applicable statutes and administrative regulations and could not locate any provisions that specifically regulated the disposal of the District's solid waste. The City observes that comprehensive regulations concerning solid waste management appear in K.A.R. 28-29-1 *et seq.* Consequently, the City contends that there is clear authority for it to impose conditions on waste disposal that are even more stringent than those imposed by KDHE.

## Discussion

We do not agree with the District's characterization of the current law concerning preemption. *Jennings* does not support the proposition advanced by the District. Rather, *Jennings* indicates preemption by the State when specific uniform statutes occupy the subject field. 214 Kan. at 401. (Class action by plaintiffs not connected to city sewer who were assessed a city sewer service fee. The legislature had enacted service fee statutes applicable to all cities.). *Uhl* is similarly unsupportive, focusing on preemption through specific statutory conflicts with local regulation. 590 F.2d at 843. (Cities may not enforce collection of mandatory trash collection fees by termination of water utility services because state statute provides exclusive method for collection.). In *Blevins*, we explained that "[n]o one questions, a city's power to legislate by ordinary ordinance in the exercise of its police power so long as such ordinance does not conflict with state law, unless a state

statute specifically preempts the field." 247 Kan. at 6. The fact that the State has enacted legislation dealing with a particular field does not necessarily deprive a city of the power to concurrently regulate an aspect of the subject area, as long as the city's regulation does not conflict with State law. See *Garten Enterprises, Inc. v. City of Kansas City*, 219 Kan. 620, Syl. ¶ 6, 549 P.2d 864 (1976). We have consistently rejected the doctrine of implied preemption, reasoning that legislative intent to reserve exclusive jurisdiction must be clear. *City of Junction City v. Griffin*, 227 Kan. 332, 336, 607 P.2d 459 (1980).

In *Johnson County Memorial Gardens, Inc. v. City of Overland Park*, 239 Kan. 221, 718 P.2d 1302 (1986), we considered whether zoning ordinances applied to an application for a permit to build a storage shed on cemetery grounds. The construction and maintenance of cemeteries were extensively regulated by statute. We reasoned that the city zoning laws were not preempted by State laws on cemeteries because the State laws did not specifically prohibit local zoning and land use regulations. 239 Kan. at 227.

The reasoning in *Johnson County Memorial Gardens, Inc.* applies to the case at bar. The KDHE regulatory authority referenced by the District is aimed at protecting public health. K.S.A. 65-163 falls under the "Public Health" heading. Domestic water supply regulations also focus on the public health. The City is free to regulate land use as long as it does not impose requirements that oppose or work at cross-purposes with the public health goals. We observe that the District applied for the use permit. The issue before us is the reasonableness of the permit's conditions. The District has not shown that the special conditions would have a negative effect on its sanitary water supply.

### Immunity From Local Zoning Restrictions

The District asserts that it is a quasi-municipal water utility, entitled to immunity from local zoning restrictions. *Herrmann v. Board of Butler County Comm'rs*, 246 Kan. 152, Syl. ¶¶ 3-4, 785 P.2d 1003 (1990), considered the principles that guide the determination of whether a governmental entity is immune from land use regulations. In *Herrmann*, we followed the rationale of *Brown v. Kansas Forestry, Fish and Game Commission*, 2 Kan.

App. 2d 102, 576 P.2d 230 (1978). *Brown* adopted the five-part analysis of *Rutgers v. Piluso*, 60 N.J. 142, 286 A.2d 697 (1972). See *Brown*, 2 Kan. App. 2d at 106-07.

The Forestry, Fish and Game Commission (Commission) in *Brown* wanted to construct a public parking lot for patrons using a fishing and recreation facility. The planned location of the parking lot was in the middle of a 23-lot subdivision zoned for single-family homes. The Commission's claim of immunity from county zoning regulation was denied. The initial decision on reasonableness can "be made more expeditiously and with greater discernment by the local zoning authority." 2 Kan. App. 2d at 114.

In *Herrmann,*the Board of County Commissioners, following a public hearing, issued a special use permit allowing construction of a state-owned prison. Two area landowners sued the Board, alleging that a prison was not a permissible use for land zoned agricultural. The State intervened under K.S.A. 60-224(a) (2), contending it was immune from county zoning regulations. Neither the plaintiffs in *Herrmann* nor those in *Brown* were seeking a use permitted on review.

We need not resolve the immunity issue. The District, in the case at bar, sought a use permitted on review. The District filed its request, paid the $500 application fee, and was satisfied with the procedure until its second appearance before the City. The District contends the monofill operation at issue falls within the definition of "waterworks" in K.S.A. 19-3511. The District argues that K.S.A. 19-3511 specifically authorizes jurisdiction over land used for its water treatment. The District concludes that it was not required to seek a special use permit for the monofill operation. It did so in the spirit of cooperation, expecting that the permit would be granted without the imposition of any onerous or burdensome conditions.

The District, in filing for the special use permit, followed the path it initiated in 1990. We encourage cooperation between governmental units. The voluntary spirit is usually commendatory in governmental relationships. One governmental unit should not be penalized for initiating cooperation. The issue before us, however, is not the District's immunity from the City's zoning ordinances,

but the reasonableness of the conditions imposed in granting the District what it wanted, a special use permit.

We agree with the trial court's observations:

"Of great significance here is that defendant granted plaintiff the permit it requested. It did limit it to four years and attach certain other conditions to it. Nevertheless, it allowed plaintiff as it requested to deposit a by-product of its water treatment process on the land in question. This is not a situation where defendant gave no deference to the public nature of plaintiff and its statutory mandate to provide water to the citizens of Johnson County.

"The court believes it significant that the State did not allow the plaintiffs to directly discharge this by-product into the river as an alternative to depositing it in these monofills. Obviously, there is some concern about the impact of the sludge on the environment even though it may not fall into the category of hazardous waste. This certainly weighs in favor of subjecting plaintiff to the City's zoning laws and procedure."

Affirmed.